**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
Keith M. Fleischman (KF-0199)
Ronald J. Aranoff (RA-4690)
10 East 40th Street, 22nd Floor
New York, New York 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218

**Attorneys for Plaintiffs**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHKELQIM KOLARI and SARAH VAIL on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>NEW YORK-PRESBYTERIAN HOSPITAL, NEW YORK-PRESBYTERIAN HEALTHCARE SYSTEM, INC., AMERICAN HOSPITAL ASSOCIATION, and JOHN DOES 1-10,<br><br>Defendants. | CIVIL ACTION NO. 04 CV 5506 (LAP)<br><br>**AMENDED CLASS ACTION COMPLAINT FOR: VIOLATIONS OF THE EMERGENCY MEDICAL TREATMENT AND ACTIVE LABOR ACT (42 U.S.C. § 1395 _et. seq._); VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT (15 U.S.C. § 1692 _et seq._); VIOLATIONS OF 42 U.S.C. § 1983 AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION; BREACH OF CONTRACT; BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING; VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349; BREACH OF CHARITABLE TRUST; FRAUD; CONSTRUCTIVE FRAUD; UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST; CIVIL CONSPIRACY AND CONCERT OF ACTION; AIDING AND ABETTING; INJUNCTIVE RELIEF AND DECLARATORY RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Shkelqim Kolari and Sarah Vail, by their attorneys, bring this action on behalf of themselves and all other persons similarly situated for their claims under The Emergency Medical Treatment and Active Labor Act, (42 U.S.C. § 1395 *et. seq.*), The Fair Debt Collection Practices Act, (15 U.S.C. § 1692 *et seq.*), 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the United States Constitution, New York General Business Law § 349, and for claims of breach of contract, breach of duty of good faith and fair dealing, breach of charitable trust, unjust enrichment/constructive trust, fraud, constructive fraud, civil conspiracy and concert of action, aiding and abetting, injunctive relief and declaratory relief. On information and belief, formed after an inquiry reasonable under the circumstances, except as to those allegations which pertain to the named Plaintiffs (which are alleged on personal knowledge), Plaintiffs hereby allege as follows:

## INTRODUCTION

1.    Defendant New York Presbyterian Hospital ("NYP") consists of five centers: the Weill Cornell Center; the Columbia Presbyterian Center; the Allen Pavilion; the Westchester Division; and the Morgan Stanley Children's Hospital (located at the Columbia Presbyterian Center). NYP's campuses are the primary teaching sites of the medical colleges of Columbia and Cornell Universities. NYP is one of the largest and most comprehensive university hospitals in the world with leading specialists in every field of medicine.

2.    Defendant New York-Presbyterian Healthcare System ("NYPHS") is a federation of 52 institutions which includes top-level hospitals, specialty institutes, and continuing care centers in New York, New Jersey, and Connecticut. In 2002, NYPHS was comprised of

1

approximately 33 tax-exempt acute-care and community hospitals in the State of New York and the surrounding metropolitan area.

3.      Upon information and belief, Defendant NYPHS, an umbrella federation of hospitals, including Defendant NYP, sets the policies and directly contributes to and exerts influence and control over its member hospitals with respect to a variety of issues including the treatment and billing practices of the uninsured population. Defendant NYPHS acts directly and indirectly through its member hospitals with respect to all aspects of patient care and billing, although NYPHS is not itself a licensed hospital. Defendant NYP together with Defendant NYPHS are hereinafter collectively referred to as "NYP Defendants."

4.      Defendant American Hospital Association ("AHA"), is the national trade association for the nonprofit hospital industry, and serves as the representative for Defendants NYP and NYPHS and its nonprofit hospital members.  According to its website, (www.aha.org), the AHA "ensures that members' perspectives and needs are heard and addressed in national health policy development, legislative and regulatory debates, and judicial matters."

5.      Upon information and belief, Defendant AHA directly contributes to and exerts control and influence over its member hospitals with respect to their treatment and billing of the uninsured population. Defendant AHA together with the NYP Defendants are, hereinafter collectively referred to as "Defendants."

6.      The NYP Defendants have operated free from federal, state and local taxes because they promise the federal, state and local governments that they will operate as charity providers of health care for the uninsured and that they will not engage in business "directly or indirectly, for the benefit of private interests."  In reality, however, the NYP Defendants do just the opposite: they charge their uninsured patients significantly more than those who have means,

2

generally pursuing the poor or uninsured relentlessly by aggressive and humiliating collection techniques.

7.     The NYP Defendants have inflated charges for patients without insurance for the purpose of boosting subsidies received from federal and state governments and to increase profits from third party payers.  Higher charges for the uninsured have led to higher reimbursements to the NYP Defendants from the federal and state governments and from third party insurance companies which negotiate "discounts" off of the highest chargemaster prices imposed only on uninsured patients.

8.     At the expense of uninsured patients, the NYP Defendants have been "gaming" the system to inappropriately maximize payments from government and third party payers.

9.     The NYP Defendants enjoy enormous Federal and State tax benefits as supposedly "charitable" organizations.  In order to operate their hospitals free from tax, the NYP Defendants promise the government – and, by extension, the New York, New Jersey and Connecticut patient populations they serve – that they do, and will, operate their hospitals on a non-profit basis and provide health care services to all patients regardless of ability to pay. Moreover, Defendant NYP represents to the public on its website that it is a "non-profit institution . . . dedicated to helping people from all walks of life . . . . [providing] about $100 million annually in charitable and uncompensated care to patients without means."

10.     In fact, the NYP Defendants do not provide the promised care to the uninsured, but actually discriminate against the very uninsured who are supposed to benefit most from the NYP Defendants' "charity," because the NYP Defendants engage in a pattern and practice of charging inordinately inflated rates for medical care to patients who are uninsured, such as Plaintiffs and the Class they seek to represent.

11.     The NYP Defendants, although enjoying the full tax advantages of a non-profit hospital system, are actually quite "profitable." In 2002, NYP had net assets totaling approximately $1,357.7 million[1] among its two tax-exempt acute care hospitals, of which $603.3 million, or 44%, was unrestricted.[2] This profit was accumulated because NYP evaded taxation while charging its patients anything but charitable rates, and because the NYP Defendants employed aggressive collection agents to collect outstanding inflated bills.

12.     Despite their surplus revenues and substantial federal, state, and local tax exemptions, the NYP Defendants have engaged in a pattern and practice of charging inordinate and inflated rates for medical care to Plaintiffs and the Class.

13.     The NYP Defendants charge Plaintiffs and the Class substantially more for medical services than they charge their insured patients for the same services. They also employ aggressive, abusive, and humiliating practices to recover these inflated medical debts from Plaintiffs and the Class. The abusive billing and collection practices violate the NYP Defendants' tax exemption agreements with the United States Government, the State of New York, and City of New York to provide mutually affordable medical care to Plaintiffs and the Class in return for substantial federal, state, and local tax exemptions. Moreover, by continuing these abusive and humiliating collection practices, the NYP Defendants have breached their duty of good faith and fair dealing toward Plaintiffs and the Class.

14.     In addition to their direct attempts to aggressively collect on inflated medical debts, the NYP Defendants receive assistance in conducting these unconscionable collection

---

[1]     Includes unrestricted, temporarily restricted, and permanently restricted net assets.

[2]     Unrestricted net assets represent those assets that are available for all purposes of the institution at the discretion of the governing board.

practices from outside, and other, collection agencies, including <u>inter alia</u>, First Consulting

Group ("FCG")[3], and Network Recovery Services, Inc. ("NRS")[4], who act as the NYP

Defendants' agents in collecting outstanding bills from uninsured patients (hereinafter,

collectively, the "Collection Agencies"). These Collection Agencies, at the NYP Defendants'

urging, use abusive, harassing tactics in collecting the NYP Defendants' outstanding bills, and

thus deprive the uninsured of the "charity care" they are supposed to receive. Further, this

abusive, discriminatory and unfair conduct, toward Plaintiffs and the Class is a violation of the

NYP Defendants' duty of good faith and fair dealing and violates New York General Business

Law §349. The NYP Defendants have been unjustly enriched at the expense of Plaintiffs and the

Class thereby warranting the imposition of a constructive trust on their wrongfully obtained tax

savings, assets, and profits.

15.    In 2002, NYPHS incurred approximately $1.1 million in collection agency fees.

Further, in 2002, NRS had gross receipts of approximately $6.8 million.

### THE LACK OF HEALTH INSURANCE IN NEW YORK

16.    According to a recent study, 82 million people – nearly one third of the United

States population younger than 65 – lacked health insurance at some point over the last two

years.

17.    The lack of health insurance is a major problem for many New Yorkers. For

example, in 2002, most uninsured New Yorkers (57% in New York City, and 59% in New York

---

[3]    FCG boasts, on its website (www.fcg.com), "[w]hether it is . . . bill scrubbing and submission, collection . . . we can help."

[4]    NRS was incorporated as a collection agency for NYP and affiliated institutions. It is a <u>tax free</u> collection agency.

State) work full-time. Some uninsured New Yorkers (10% in New York City, and 13% in New York State) work part-time, while 33% in New York City and 29% in New York State were unemployed.

18.    During 2001–2002, 45% of non-citizens, compared to 20% of citizens in New York City were uninsured; and 43% of non-citizens, compared to 14% of citizens were uninsured in New York State.

19.    Because the Medicare program provides health insurance for most people age 65 and over, the uninsured are almost entirely under the age of 65. In 2002, 25% (or 1.8 million) of the 7.2 million people below age 65 in New York City were uninsured, while 18% (or 3.0 million) of the 16.9 million people below age 65 in New York State were uninsured.

20.    During the period 2000–2002, New York State's uninsured rate was higher than that of the United States. For example, in 2002, New York State's uninsured rate was 18% (25% in New York City) versus 17% for the United States; in 2001, New York State's uninsured rate was 18% (26% in New York City) versus 16% for the United States; and in 2000, New York State's uninsured rate was 18% (25% in New York City) versus 16% for the United States.

21.    During 2002, in New York City, 32% of Hispanics were uninsured (28%, rest of state); 24% of non-Hispanic Blacks were uninsured (22%, rest of state); compared to 16% of non-Hispanic White (10%, rest of state).

22.    Employer-based coverage is often unavailable or unaffordable. Uninsured people who have jobs may face one or more of the following barriers:

    a.    Smaller employers are less likely to offer health insurance to their
          employees because premiums are prohibitively expensive;

6

    b.      Service and labor jobs are less likely to provide workers with health insurance;

    c.      Part-time workers are often not eligible for insurance;

    d.      Even when employers offer health insurance to low-wage workers, the premiums tend to be higher than for higher-paid workers. Low-wage workers have a harder time affording these premiums, and are more likely to remain uninsured.

23.    Further, people who lose their jobs often lose their health insurance.

24.    Some workers who lose their jobs may be able to keep their health insurance through COBRA.[5] To obtain COBRA coverage, workers must pay the entire cost of the premium. Premiums are expensive, and newly unemployed workers have generally had their incomes dramatically reduced.

25.    Buying coverage in the private individual market is often prohibitively expensive. People with any sort of health problem or risk factor, from hay fever to HIV, must pay significantly more for private insurance, or may not be able to obtain insurance at all.

26.    The health care safety net leaves many people uncovered, especially adults. Many low-income people, especially adults, cannot qualify for health insurance through safety net programs like Medicaid. More than 80 percent of all uninsured adults nationwide with incomes below 200 percent of the federal poverty level are ineligible for Medicaid and other public health insurance programs.

27.    Specifically, families in New York with incomes at, or below, 200 percent of the federal poverty level were much more likely to be uninsured than families with incomes above

---

[5]    The Consolidated Omnibus Budget Reconciliation Act ("COBRA") of 1985, 29 U.S.C §1161, *et seq.*

200 percent of the federal poverty level. For example, in 2002, 85% (or 1.5 million) of the 1.8 million uninsured in New York City were "low-income" individuals with annual income no greater than 200% of the federal poverty level. In 2002, for individuals, 200% of the federal poverty level was $17,720. For New York State, 84% (or 2.5 million) of the 3.0 million uninsured were low-income individuals.

## PARTIES

28.     Plaintiff Shkelqim Kolari is, and at all relevant times was, a resident of New York, residing in the County of Richmond, State of New York.

29.     Plaintiff Sarah Vail is, and at all relevant times was, a resident of New York, residing in the County of New York, State of New York.

30.     Defendant New York-Presbyterian Hospital ("NYP") operates several acute care hospitals in New York, with its principal place of business at 525 East 68th Street, Box 156, New York, NY 10021. The Internal Revenue Service ("IRS") granted NYP tax-exempt status in 1997.

31.     Defendant New York-Presbyterian HealthCare System, Inc. ("NYPHS") is a New York voluntary association, with its principal place of business at 525 East 68th Street, New York, NY 10021. The IRS granted NYPHS tax-exempt status in 1998. NYPHS describes itself, in its Form 990, "Return of Organization Exempt from Income Tax," as "the sponsor/parent of a number of tax-exempt healthcare providers and related entities and coordinates a number of support and other services to such entities" including, inter alia, "patient billing."

32.     Defendant American Hospital Association ("AHA") is the national organization that represents and serves all types of hospitals, health care networks, and their patients and communities. AHA is  headquartered at One North Franklin Street, Chicago, Illinois 60606-

8

3421. The AHA is comprised of approximately 5,000 hospitals, health care systems, networks, and other providers of care. They also have 37,000 individual members.

33.     Formed in 1997 by the merger of The New York Hospital and The Presbyterian Hospital, NYP and NYPHS enjoy the status of a "not-for-profit" tax-exempt hospital and integrated health care delivery systems. The IRS has recognized the NYP Defendants as being tax-exempt organizations under Internal Revenue Code Section 501(c)(3).

34.     The NYP Defendants publicly maintain that they provide health care services to all individuals regardless of ability to pay. For example, according to NYP's own website, NYP "provides charitable and uncompensated care to patients without means." NYP also asserted, in its Form 990s for the years ending December 31, 1998-2002, "it is recognized that not all individuals possess the ability to pay for essential medical services . . . . Therefore, in keeping with the hospital's commitment to serve all members of the community - Free and or subsidized care is provided to the indigent."

35.     Defendant NYP consists of the following acute care hospitals and other affiliated health care facilities. The number in the right hand column accounts for the approximate number of beds at the particular facility:

| HOSPITALS (6) | | |
|---|---|---|
| The Allen Pavillon | New York City, New York County | 212 |
| Children's Hospital of New York Presbyterian – Morgan Stanley Children's Hospital | New York City, New York County | 316 |
| Children's Hospital of New York Presbyterian – NewYork Weill Cornell Children's Hospital | New York City, New York County | Unknown |
| Columbia Presbyterian Medical Center | New York City, New York County | 871 |

9

| New York Weill Cornell Medical Center | New York City, New York County | 878 |
| New York-Presbyterian Hospital - Westchester Division | White Plains, Westchester County | 276 |

36.     The various other Defendants, designated John Does 1 through 10 are, based upon information and belief, certain unknown, unnamed persons and/or entities who may be liable for the claims asserted herein, who include but are not limited to agents, servants, employees, representatives, affiliates, parents, subsidiaries, joint tortfeasors, tortfeasors, contractors, co-conspirators, joint adventurers, partners, stockholders, and any other person or entities of the named Defendants and/or any other persons who may be liable to the Plaintiffs and the Class for the claims asserted herein.

## JURISDICTION AND VENUE

37.     This Court has jurisdiction over the subject matter of this controversy pursuant to 28 U.S.C. §§1331 and 1367 because Plaintiffs' claims arise out of violations of the Emergency Medical Treatment and Active Labor Act (28 U.S.C. §1395 *et. seq.)*, violations of the Fair Debt Collection Practices Act, (15 U.S.C. §1692), violations of 42 U.S.C. § 1983 and violations of the Fifth and Fourteenth Amendments to the United States Constitution. Additionally, Plaintiffs' claims arise out of a federal contract between the NYP Defendants and the United States Government in which the NYP Defendants agreed to provide mutually affordable medical care to its uninsured patients in exchange for tax exempt status under 26 U.S.C. §501(c)(3).

38.     Venue in this Court is proper pursuant to 28 U.S.C. §1391(b), because New York-Presbyterian Hospital and New York Presbyterian Healthcare System have their principal places of business in New York County.  In addition, the events giving rise to the claims herein occurred in New York County.

## FACTS

### Defendants NYP's and NYPHS' Tax Exempt Status

39.    Since 1997, the NYP Defendants have operated acute care hospitals throughout the State of New York and the surrounding metropolitan area.

40.    The NYP Defendants entered into express and/or implied Agreements with the United States Government, the State of New York and local governments to provide mutually affordable medical care to all of their patients in return for substantial tax exemptions. An express and/or implied contractual relationship was thereby created between the NYP Defendants and the United States Government, the State of New York and local governments to accomplish that purpose. The NYP Defendants' uninsured patients were the express and/or implied intended third party beneficiaries of such Agreements.

41.    The NYP Defendants have applied for and received federal income tax exemption as purported "charitable" institutions pursuant to 26 U.S.C. §501(c)(3). Pursuant to 26. U.S.C. §501(c)(3), the NYP Defendants are required to operate their hospitals "exclusively" in furtherance of a charitable purpose, with no part of their operations attributable directly or indirectly to any noncharitable commercial purpose. By accepting this favorable tax exempt status, the NYP Defendants explicitly and/or implicitly agree: to provide emergency rooms access and treatment to all of their uninsured patients without regard to their ability to pay for such care; to provide mutually affordable medical care to all of their patients; to charge their uninsured patients only a reasonable cost for medical care; not to charge their uninsured patients the highest and full undiscounted cost for medical care; not to charge their uninsured patients a higher rate for medical care than their insured patients; to use their net assets and revenues to

11

provide mutually affordable medical care to their uninsured patients; and not to pursue outstanding medical debt from their uninsured patients through aggressive, abusive and humiliating collection efforts.

42.      Since 1997, the NYP Defendants have also received state and local income, property and sales tax exemptions from the State of New York and local governments as nonprofit entities because they supposedly operate exclusively for charitable purposes under *inter alia*, New York's Not-For Profit Corp. Law, PCL §402, and New York Real Property Law, RPTL §420(a), *et. seq.*

43.      In addition to enjoying the benefits of federal, state and local tax exempt status, the NYP Defendants have also received charity care subsidies from the State of New York's "Indigent Care and High Need Indigent Care Adjustment Pool" as compensation for unpaid medical bills, pursuant to New York State's Health Care Reform Act ("HCRA").

### The NYP Defendants' Admission and Billing Practices

44.      Prior to the NYP Defendants' admission of any patient, including uninsured patients, into their hospitals and/or emergency rooms for emergency medical care, the NYP Defendants require their patients to sign a form contract promising to pay, in full, for unspecified and undocumented charges for medical care that are pre-set by the NYP Defendants in their sole discretion.  The NYP Defendants will not admit a patient into their emergency rooms for emergency medical care unless that patient agrees to pay in full for such unspecified and undiscounted charges.  Often times, patients are asked to sign these forms when they are in no condition to know what they are signing.

12

45.     Despite their favorable tax exempt status, state subsidies for charity care, and their substantial net assets and revenues which total in the billions of dollars, the NYP Defendants have breached their contracts with the federal, state and local governments by: failing to provide emergency room medical care to their uninsured patients without regard for their ability to pay for such care; charging uninsured patients the highest and undiscounted cost for medical care at grossly inflated rates as compared to the actual cost of providing such services; and by engaging in aggressive efforts to collect such medical debt from their uninsured patients through abusive, harassing, and humiliating collection efforts. The NYP Defendants' uninsured patients have therefore not received the benefit of the NYP Defendants' contracts with the federal and state and local governments. These uninsured patients primarily consist of the working class who do not qualify for Medicaid, Medicare or charity care, but cannot afford private health insurance and/or cannot obtain health insurance through their employers.

46.     The NYP Defendants set their charges for medical services at highly inflated rates that bear no connection to the actual cost of providing the service (i.e., its "charge-to-cost ratio"). While the NYP Defendants give private insurance companies and governmental third party payers like Medicare and Medicaid large discounts off this gross or "sticker price,"[6] these large discounts are not provided to their uninsured patients. As a result, the NYP Defendants' uninsured patients can be charged as much as twice the amount charged to the insured for the same service.

---

[6]     The hospital's "list price" for products and services and a key variable in determining actual reimbursement from a number of payers, including Medicare, Medicaid, HMO, contractual agreements and Worker Compensation programs.

13

47.    For example, according to a June 2003 report by the Institute for Health and Socio-Economic Policy (the "IHSP Report"),[7] Defendant NYPHS had an average charge-to-cost ratio of 196.83%, well over the State average of 181.33%.

48.    The NYP Defendants provide substantial discounts for noncharitable private insurers. These discounts violate 26 U.S.C. §501(c)(3)'s prohibition against operating directly or indirectly for non-charitable commercial purposes.

49.    Over the years, the NYP Defendants have realized substantial revenues from this discriminatory charging practice.

50.    Not only do the NYP Defendants charge their uninsured patients the highest rates for medical care, which many cannot afford to pay, they also engage in the uniform pattern and practice of pursuing such debt through aggressive, abusive and humiliating collection efforts, including the filing of lawsuits.

51.    Further, to improve their billing and collection activity, in 2001 and 2002, the NYP Defendants engaged Stockamp & Associates ("Stockamp"),[8] a "revenue cycle improvement" consulting firm to "improve revenue collection at both their Cornell and Presbyterian hospital campuses." The so-called "revenue cycle reengineering project," performed at each campus, resulted in a "20 percent reduction in days in accounts receivable"

---

[7]    The IHSP Report examined Federal Hospital Cost Reports current as of March 31, 2003 for fiscal year 2000/2001.

[8]    Stockamp promises, on its website (www.Stockamp.com) that its "clients commonly achieve . . . reductions in administrative, bad-debt and charity write-offs of up to 25 percent."

14

and a "40 percent reduction in billing work in progress." In both 2001 and 2002, Stockamp was the highest paid independent contractor reported by NYP in its respective Forms 990.

52.    The Stockamp revenue cycle reingineering project had a detrimental effect on NYP's charity care program (from a billing perspective) as evidenced by a survey on "Free Care Programs"[9] at 70 New York Hospitals, conducted by the Public Policy and Education Fund of New York in 2002 and 2003 (the "Survey"). The Survey included the following report card on NYP's New York Weill Cornell Medical Center, Columbia Presbyterian Center, Allen Pavilion, and Westchester Division. Notwithstanding NYP's "commitment" to provide "free and or subsidized care . . . to the indigent" as asserted in its Form 990, these hospitals failed in several areas, including billing:

> **Free/Charity Policy Available to the Public: FAIL.** A "pass" would mean that "the hospital has <u>both</u> an application form available to the public <u>and</u> specifies the income level(s) to qualify for assistance. (Emphasis in original.)

> **Covers In-Patient and Out-Patient Services: FAIL.** A "pass" would mean that "the hospital specifically says that it covers all hospital inpatient and outpatient services, not just emergency care."

> **Holds Bills Until Application Processed: FAIL.** A "pass" would mean that "the hospital reports that it will <u>not</u> bill the patient until <u>after</u> it determines whether the patient qualifies for financial assistance."[10] (Emphasis added.)

---

[9]    "<u>Hospital Free Care, Can New Yorkers Access Hospital</u> Services Paid for by Our Tax Dollars?" (Sept. 2003), *available at* http://www.citizenactionny.org/reports/Hospital_Free_Care_Report_Final.pdf

[10]    Interestingly, Stockamp's website on "What Our Clients Have to Say ..." includes the following quote by Dr. Michael Berman, EVP & Hospital Director, New York-Presbyterian, "We've heard a lot of comments from patients about <u>getting our billing out more quickly</u>, and physicians also have made positive comments." (Emphasis added.)

**Time Limit to Apply: FAIL.** A "pass" would mean that "the hospital will accept applications for free/charity care up to three (3) months after services were provided."

**Final Grade: FAIL.**

**Amount Received from Indigent Care Pool: $60,465,162.** The "estimated 2003 Indigent Care and High Need Indigent Care Adjustment Pools distribution authorized by New York's Health Care Reform Act (HCRA). Often called 'Bad Debt and Charity Care.'"

### The NYP Defendants and The Collection Agencies' Abusive Collection Practices

53.    The NYP Defendants employ abusive collection practices, directly and through the Collection Agencies, often hounding patients for payments on patently inflated bills. In many instances, the Collection Agencies add interest, costs, and attorney fees to the uninsured's unpaid debt. The Collection Agencies act directly as collection agents for the NYP Defendants pursuing those uninsured patients who receive treatment at NYP or NYPHS-affiliated hospitals, but do not pay for those services in a timely manner.

### The NYP Defendants' Financial Condition

54.    NYPHS is the largest single hospital healthcare system in the New York metropolitan area. According to a June 1, 2001 PR Newswire news release distributed on behalf of the American Heart Journal, NYPHS "serves over 20% of the patients in the New York Metropolitan area."

55.    NYPHS reported the following "program service revenue"[11] amounts (rounded) for the years ending December 31, 1998-2002: 1998-$57.2 million; 1999-$89.9 million; 2000-$93.0 million; 2001-$97.7 million; and 2002-$98.1 million.

---

[11]    Includes government fees and contracts.

16

56.     According to <u>U.S. News & World Report</u> (www.usnews.com), between January 1, 2002 and January 1, 2003, NYP had the following patient activity:

|  |  |
|---|---|
| Admissions: | 87,952 |
| Inpatient surgeries: | 22,233 |
| Outpatient visits: | 1,066,827 |
| Outpatient surgeries: | 63,764 |
| E.R. visits: | 128,941 |
| Births: | 12,489 |
| Beds: | 2,163 |

57.     For the years ending December 31, 1998-2002, NYP reported, <u>inter alia</u>, the following financial information in its respective IRS Form 990s:

| Tax Year | Outpatient Visits | Program Svce. Rev. Care of Patient | Unrestricted Net Assets | Bad Debt Exp - Program Svce. |
|---|---|---|---|---|
|  |  | (million) |  |  |
| 1998 | 946,313 | $1,470.2 | $667.8 | $96.6 |
| 1999 | 961,679+ | $1,517.4 | $710.8 | $108.6 |
| 2000 | 937,522 | $1,600.2 | $730.6 | $109.9 |
| 2001 | 931,597 | $799.2 | $554.0 | $89.9 |
| 2002 | 954,495 | $803.5 | $603.3 | $51.6 |

58.     The impact of the 2001/2002 Stockamp revenue cycle re-engineering project to "improve collection" is clearly evident in the dramatic decrease in bad debt expense in 2001 and 2002 as compared to 2000 and before.  For example, in 2002, bad debt expense decreased to 47% of the amount reported in 2000.

**Defendant American Hospital Association**

59.     The AHA, the self-proclaimed representative of the NYP Defendants and the nonprofit hospital industry, provides substantial assistance and guidance to the NYP Defendants and the nonprofit hospital industry on their billing and collection practices for uninsured patients.

The AHA has conspired with and aided and abetted the NYP Defendants with their billing and collection practices described above.

60.    The AHA, through internal memos called "white papers" and other publications, provides substantial assistance and guidance to the NYP Defendants and the nonprofit hospital industry on their billing and collection practices for uninsured patients, including publications such as "Seven Strategies to Improve Your Bottom Line." In these publications, the AHA urges and encourages the NYP Defendants and their nonprofit hospital members to inflate their chargemaster prices, which are only imposed upon uninsured patients. These inflated chargemaster prices have the intended effect of increasing the NYP Defendants' outlier payment reimbursements under the DSH and Medicare reimbursement programs and increasing payments from other third party payers which negotiate percentage "discounts" off the inflated chargemaster prices.

61.    For example, on December 17, 2003, the AHA sent out a "white paper" titled "Federal Regulations Hamper Hospitals' Efforts to Assist Patients of Limited Means" to the NYP Defendants and their member nonprofit hospitals, which advised such hospitals that the Medicare laws and regulations prevented them from offering discounts to uninsured patients and required them to aggressively collect medical debt from the uninsured through collection lawsuits.

62.    The AHA actively conceals and misrepresents from the government and regulatory agencies the amount of charity care provided by the NYP Defendants and their nonprofit hospitals to the uninsured. According to a June 21, 2004 article in Modern Healthcare entitled "Well Kept Secret," "the AHA collects charity care data [from its members] in its annual

18

hospital survey but does not report the total. Instead, it reports uncompensated care which includes bad debt as well as charity care."

## PLAINTIFFS ALLEGATIONS

63.     On or about October 30th 2000, Plaintiff Shkelqim Kolari ("Mr. Kolari") was severely burned on his arm. He was taken by ambulance to New York Weill Cornell Medical Center.

64.     Mr. Kolari was admitted to the hospital on an in-patient basis and was transferred to the Burn Center at New York Weill Cornell Medical Center (the "Burn Center"). At the time of his October 30th admission, Mr. Kolari did not have health insurance.

65.     Mr. Kolari was discharged on or about November 10, 2000. The NYP Defendants billed Mr. Kolari approximately $58,000 for the treatment of his burns during his hospital stay.

66.     Although Mr. Kolari was discharged on November 10, 2000, Mr. Kolari required outpatient care from the Burn Center unit at least every two weeks. On each visit, prior to receiving care, the NYP Defendants required Mr. Kolari to sign a form concerning payment. He was also required to pay $75 for each visit to the NYP Defendants' hospital.

67.     On many occasions, Plaintiff was unable to pay the $75 and doctors employed by the NYP Defendants refused to see him. As a consequence, Mr. Kolari received treatment only when he was able to pay the $75. As a result, he only received treatment for his burns monthly, as opposed to bi-monthly, as mandated by NYP and his NYP doctors.

68.     Mr. Kolari began receiving collection letters demanding payment of the outstanding bills, including the threat of lawsuits, almost immediately upon his release from the

19

hospital. Mr. Kolari does not know the identity of the individual and/or entities who made the telephone calls attempting to collect upon the NYP Defendants' bills.

69.    In November 2002, Sarah Vail ("Ms. Vail"), was admitted to the New York Weill Cornell Medical Center due to complications stemming from her pregnancy. At the time of her admission, Ms. Vail did not have any health insurance.

70.    Ms. Vail was admitted for approximately three days and two nights at New York Weill Cornell Medical Center. Ms. Vail was billed approximately $20,000.

71.    Almost immediately after her release from the hospital, Ms. Vail began receiving telephone calls demanding payment of the outstanding hospital bills. She was also threatened with the filing of lawsuits. Ms. Vail does not know the identity of the individual and/or entities who made the telephone calls attempting to collect upon the NYP Defendants' bills.

72.    Additionally, Ms. Vail has since received persistent written correspondence attempting to collect on her unpaid hospital invoices.

73.    In receiving treatment at the NYP Defendant hospitals, Plaintiffs Kolari and Vail received hospital services from NYPHS as the umbrella federation which oversees, controls and establishes standards for treatment and billing of the uninsured population. Neither NYP nor NYPHS ever informed either Mr. Kolari or Ms. Vail about the availability of charity care.

### CLASS ACTION ALLEGATIONS

74.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"), Plaintiffs bring this class action on their own behalf and as representatives of the following Class:

> All persons who received any form of healthcare treatment from Defendant NYP and/or NYPHS and who were uninsured at the time of treatment.

20

75.     Excluded from the Class are Defendants, Defendants' officers, directors, legal representatives, heirs, successors, and assigns and any judicial officer assigned to this case and his or her immediate family.

76.     The rates charged by the NYP Defendants to Plaintiffs significantly exceeded the discounted rates charged by the NYP Defendants for insured patients or patients with Medicaid or Medicare coverage. The rates charged by the NYP Defendants to Plaintiffs bear no relation to the actual cost of the medical care.

77.     Plaintiffs are members of the Class they seek to represent.

78.     The members of the Class consist of thousands of individuals and therefore is so numerous that joinder is impracticable. Plaintiffs do not know the exact number of class members because such information is in the exclusive custody and control of Defendants, but, on information and belief, the number is in the thousands.

79.     Plaintiffs' claims are typical of the claims of the Class because both Plaintiffs and the Class sustained damages as a result of the NYP Defendants' unfair and discriminatory charging and/or collection practices, with respect to its uninsured patients, by seeking the full undiscounted cost of medical care.

80.     There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual class members including, *inter alia*:

> a.     whether the NYP Defendants entered into express and/or implied contracts
> with the United States Government and New York state and local
> governments that, in return for substantial tax exemptions, they would:
>
> > (i)     operate exclusively for charitable purposes;

21

  (ii)  provide mutually affordable medical care to Plaintiffs and Class without regard to their ability to pay for such medical care;

  (iii)  provide affordable medical care to Plaintiffs and the Class; and

  (iv)  not seek to collect outstanding medical debt from Plaintiffs and the Class through aggressive, abusive, and humiliating collection practices;

b.  whether the NYP Defendants breached their contracts with the United States Government, the New York State and local governments and the uninsured of New York by:

  (i)  failing to operate exclusively for charitable purposes;

  (ii)  failing to provide emergency room medical care to Plaintiffs and the Class without regard to their ability to pay for such medical care;

  (iii)  failing to provide mutually affordable medical care to Plaintiffs and the Class;

  (iv)  allowing charitable "for profit" physician groups and service providers to derive profit from their tax exempt hospitals; and

  (v)  seeking to collect outstanding medical debt from Plaintiffs and the Class through aggressive, abusive, and humiliating collection practices;

22

c. whether Plaintiffs and the Class are the express and/or implied intended third party beneficiaries to the NYP Defendants' contracts with the United States Government, and the New York state and local governments;

d. whether the NYP Defendants charged Plaintiffs and the Class inflated rates for medical care in violation of their charitable, nonprofit, tax exempt status;

e. whether the NYP Defendants charged Plaintiffs and the Class higher amounts for medical care than their insured patients in violation of their charitable, nonprofit, tax-exempt status;

f. whether the NYP Defendants profited by charging Plaintiffs and the Class the highest rates for medical care;

g. whether the NYP Defendants billed Plaintiffs and the Class unreasonable charges for medical care;

h. whether the NYP Defendants failed to provide emergency room medical care to Plaintiffs and the Class without regard to their ability to pay for such medical care in violation of 26 U.S.C. §501(c)(3) and 42 U.S.C. §1395dd;

i. whether the NYP Defendants conditioned emergency room medical screening and/or treatment to Plaintiffs and the Class on their ability to pay or financial guarantees to pay for such medical care in violation of 26 U.S.C. §501(c)(3) and 42 U.S.C. §1395dd;

23

j.     whether the NYP Defendants should have utilized their sizable financial resources to provide a greater amount of mutually affordable medical care to Plaintiffs and the Class pursuant to their charitable, nonprofit, tax exempt status;

k.     whether the NYP Defendants, either directly or through the Collection Agencies, have utilized aggressive, unfair, abusive, and harassing collection practices, lawsuits, liens, and garnishments to collect medical payments from Plaintiffs and the Class in violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq.*, and their tax exempt status;

l.     whether the NYP Defendants violated the anti-inurement provision under 26 U.S.C. §501(c)(3);

m.     whether the NYP Defendants violated 26 U.S.C. §501(c)(3) by providing substantial discounts for noncharitable private insurers;

n.     whether the NYP Defendants failed to operate exclusively for charitable purposes by allowing noncharitable for-profit entities to derive a profit from their use of their tax-exempt hospitals in violation of 26 U.S.C. §501(c)(3);

o.     whether the NYP Defendants breached their duty of good faith and fair dealing to Plaintiffs and the Class;

p.     whether a charitable trust was created for the benefit of Plaintiffs and the Class;

24

q.  whether the NYP Defendants' actions, as alleged in the Complaint, violated New York General Business Law §349;

r.  whether the NYP Defendants have been unjustly enriched at Plaintiffs' and the Class' expense;

s.  whether the AHA conspired with the NYP Defendants to breach their contracts with the United States Government, the State of New York and local governments;

t.  whether the AHA aided and abetted the NYP Defendants' violations and breaches;

u.  whether the AHA aided and abetted the NYP Defendants' violations of 42 U.S.C. §1983, the Fourteenth Amendment to the United States Constitution and the Fifth Amendment to the United States Constitution;

v.  whether the NYP Defendants acted under color of state law and are liable to Plaintiffs under 42 U.S.C. §1983 for violations of their constitutional rights under the Fourteenth Amendment to the United States Constitution;

w.  whether the NYP Defendants acted under color of federal law and are liable to Plaintiffs for violating their constitutional rights under the Fifth Amendment to the United States Constitution;

x.  whether the NYP Defendants committed fraud or constructive fraud upon Plaintiffs and the Class;

y.  whether the NYP Defendants should be enjoined from continuing their unfair, discriminatory, and abusive conduct; and

z.    whether the NYP Defendants are liable to Plaintiffs and the Class in this action, as alleged in this Complaint.

81.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs have retained competent and experienced counsel in complex class actions, including consumer protection class actions. Counsel is committed to the vigorous prosecution of this action.

82.    The prosecution of separate actions by Plaintiffs and individual members of the Class against the Defendants would create a risk of inconsistent or varying adjudications on the common issues of law and fact related to this action.

83.    A Class Action is superior to all other available methods for the fair and efficient adjudication of this controversy.

84.    The expense and burden of litigation would substantially impair the ability of the Class Members to pursue individual cases in order to initiate their rights. In the absence of a class action, the Defendants will retain the benefits of their wrongdoing.

85.    Class Certification pursuant to Rule 23(b)(3) is appropriate because the common issues of fact and law alleged herein are common to the Class and predominate over any questions affecting only individual members, thereby rendering the class action superior to all other available methods for the fair and efficient adjudication of this controversy.

86.    Class Certification is also appropriate pursuant to Rule 23(b)(2) because, as set forth in the Complaint, the NYP Defendants have acted and/or refused to act on grounds generally applicable to Plaintiffs and the Class, thereby warranting appropriate injunctive and/or declaratory relief.

26

## CAUSES OF ACTION

### COUNT ONE

### BREACH OF CONTRACT
**(Third Party Beneficiaries)**

87.      Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

88.      The NYP Defendants' express and/or implied contracts with the United States Government pursuant to 26 U.S.C. §501(c)(3), and with New York's state and local governments pursuant to, inter alia, New York's Not-For Profit Corp. Law, PCL §402, and New York Real Property Law, RPTL §420(a). *et. seq.*, were formed to directly benefit New York's uninsured.

89.      The NYP Defendants, as purported charitable entities under 26 U.S.C. §501(c)(3), entered into an express and/or implied Agreement with the United States Government pursuant to 26 U.S.C. §501(c)(3) that, in return for a substantial federal income tax exemption valued in the millions of dollars, they would: operate exclusively for charitable purposes; provide emergency room medical care to Plaintiffs and the Class without regard to their ability to pay for such medical care; provide mutually affordable medical care to Plaintiffs and the Class; not pursue outstanding medical debt from Plaintiffs by engaging in aggressive, abusive, and humiliating collection practices; and not provide financial inurement to private individuals and entities.

90.      The NYP Defendants, as purported institutions of public charity, also entered into express and/or implied Agreements with the State of New York and local governments that, in return for substantial state income, property, and sales tax exemptions valued in the millions of

27

dollars, they would: operate exclusively for charitable purposes; provide emergency room

medical care to Plaintiffs and the Class without regard to their ability to pay for such medical

care; provide mutually affordable medical care to Plaintiffs and the Class; not pursue outstanding

medical debt from Plaintiffs and the Class by engaging in aggressive, abusive, and humiliating

collection practices; and not provide financial inurement to private individuals and entities.

91.    Plaintiffs and the Class are the express and/or implied intended third party

beneficiaries of the NYP Defendants' contracts with federal, state and local governments in that

the NYP Defendants agreed to provide mutually affordable medical care to Plaintiffs and the

Class in return for substantial federal, state and local tax exemptions.

92.    The NYP Defendants breached the above-mentioned Agreements with the United

States Government, the State of New York, and local governments by: failing to provide

emergency room medical care to Plaintiffs and the Class without regard to their ability to pay for

such medical care; charging Plaintiffs and the Class inflated rates for medical care; charging

Plaintiffs and the Class more than their insured patients for the same medical services; failing to

use their net assets and revenues in the hundreds of millions of dollars to provide mutually

affordable medical care to Plaintiffs and the Class; utilizing aggressive, abusive and humiliating

collection practices such as lawsuits, liens, and garnishments to collect such inflated and

unreasonable medical debt from Plaintiffs and the Class; and allowing non-charitable, for-profit

entities to derive a profit from use of their tax-exempt hospital.

93.    As a result of such conduct, Plaintiffs and the Class have been damaged in that

they have not received the benefit of the NYP Defendants' contracts with Federal, State and local

28

governments. Such conduct is also contrary to the NYP Defendants' purported charitable purpose and their nonprofit status.

## COUNT TWO

## BREACH OF CONTRACT

94.    Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

95.    Plaintiffs and the Class entered into express form contracts with the NYP Defendants whereby Plaintiffs and the Class were required to agree to pay unspecified and undocumented charges for medical care set by the NYP Defendants. Imputed in these contracts is the express and/or implied contractual obligation by the NYP Defendants that they would charge Plaintiffs and the Class no more than a fair and reasonable charge for such medical care. Any ambiguity in the contracts as to what fair, reasonable, customary, or what other similar terms mean, should be resolved against the Defendants that drafted these agreements. Fair, reasonable, or other similar language should be construed in a manner that most favors Plaintiffs who: (1) did not draft the agreements and did not have an opportunity to negotiate language or terms, (2) were forced to sign these contracts at a time of stress and medical need, and (3) whose understanding of reasonable, fair, or customary was reasonably colored by the not-for-profit/community health care provider status of the NYP Defendants. Plaintiffs and the Class never contemplated that usual, fair, customary, and other such language would mean multiple times what insured patients or the government would be charged. Plaintiffs and the Class reasonably did not contemplate that they would never be screened for or offered potential charity care or reduced cost care.

29

96.     Similarly, by accepting and admitting Plaintiffs and the Class into their hospital for medical care, the NYP Defendants undertook an express and/or implied contractual obligation to charge Plaintiffs and the Class no more than a fair and reasonable charge for such medical care.

97.     The NYP Defendants breached their contractual obligations under these form contracts by charging Plaintiffs and the Class inflated rates for medical care.  These charges are unfair, unreasonable, and bear no relation to the actual cost of providing such services.

98.     The above-mentioned breaches of contract have proximately caused Plaintiffs and the Class economic injury and other damages.

## COUNT THREE

## IMPLIED RIGHT OF ACTION UNDER SECTION 501(C)(3)

99.     Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

100.    Under 26 U.S.C. §501(c)(3), the NYP Defendants were required to be "organized and operated for . . . charitable purposes."

101.    A hospital which promotes the health of a limited class of beneficiaries serves the private interests of those individuals rather than the public interests, and is therefore, not organized and operated exclusively for a charitable purpose.

102.    The NYP Defendants have promoted the health of insured patients by giving these patients substantial discounts while charging uninsured patients inflated rates.

103.    The inflated medical rates charged by the NYP Defendants constitute a significant barrier for uninsured patients to obtain needed medical services.

30

104.    Uninsured patients are the specific intended beneficiaries of the NYP Defendants'

agreement with the federal government to operate exclusively for charitable purposes and

uninsured patients are the specific victims of Defendants' discriminatory pricing practices which

violate their obligations under 26 U.S.C. §501(c)(3).

105.    The injuries to Plaintiffs are distinct and palpable. Plaintiffs had no insurance,

they were charged a premium rate for medical services they received when compared to rates

charged to Medicare and Medicaid recipients and persons covered by private third-party

insurance. But for their medical indigency, Plaintiffs wold have been charged substantially less

for the services they received.

106.    The NYP Defendants' conduct in charging these premium rates to Plaintiffs are

the direct source of Plaintiffs' injury. The injury is fairly traceable to the existence of the tax

exemption. The very size of the rates charged is a direct function of the NYP Defendants'

contractual obligation to provide "significant" care to the medically indigent under 26 U.S.C.

§501(c)(3). By charging those without insurance extraordinarily high rates, knowing that the

uninsured will likely not be able to pay all of the amounts billed, the NYP Defendants can write

off large amounts, call the bad debt write offs "charity care," and appear to be acting as a

charitable organization. This practice permits the NYP Defendants to appear to provide

financially large (and hyper-inflated) amounts of charity care for the purpose of maintaining their

26 U.S.C. §501(c)(3) exemption. Moreover, these premium rates, and the NYP Defendants'

aggressive collection efforts, discourage return visits by the medically indigent to the NYP

Defendants' facilities.

31

107.    Plaintiffs and the Class have an implied right of action against the NYP Defendants for their discriminatory and unconscionable pricing practices which violate their obligations to operate exclusively for charitable purposes and which have caused Plaintiffs and the Class economic injuries.

## COUNT FOUR

### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

108.    Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

109.    The NYP Defendants' discriminatory treatment of New York's uninsured also constitutes a breach of their duty of good faith and fair dealing implied by law in all contracts in New York.

110.    The NYP Defendants have breached their duty of good faith and fair dealing to Plaintiffs and the Class by failing to provide the promised care and services and by discriminating against New York's uninsured through the unfair pricing structure and aggressive, abusive and humiliating collection practices.

111.    Such unfair and bad faith conduct by Defendants has proximately caused economic injury and other damages to Plaintiffs and the Class.

112.    Plaintiffs and the Class are express and/or implied intended third party beneficiaries of Agreements between the United States Government, the State of New York and local governments, wherein the NYP Defendants agreed to provide mutually affordable medical care to Plaintiffs and the Class in return for substantial federal, state, and local tax exemptions.

32

113.    Alternatively, Plaintiffs and the Class entered into an express and/or implied contractual relationship with the NYP Defendants wherein Plaintiffs and the Class members were admitted to the NYP Defendants' medical facilities for the purpose of receiving medical care.

114.    The NYP Defendants breached their duty of good faith and fair dealing to Plaintiffs and the Class by: failing to provide emergency room care to Plaintiffs and the Class without regard to their ability to pay for such care; charging Plaintiffs and the Class inflated rates for medical care; charging Plaintiffs and the Class a higher amount for medical services than they charged their insured patients or their Medicare patients for the same services; utilizing aggressive, abusive, and harassing collection practices such as collection lawsuits, liens, and garnishments to collect such outstanding grossly inflated medical debt from Plaintiffs and the Class; and allowing noncharitable for-profit entities to derive a profit from use of their tax-exempt hospitals.

115.    Such unfair and bad faith conduct by the NYP Defendants proximately caused economic injury and other damages to Plaintiffs and the Class.

**COUNT FIVE**

**BREACH OF CHARITABLE TRUST**

116.    Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

117.    By accepting federal, state and local tax exemptions under 26 U.S.C. §501(c)(3) and New York General Business Law §349, the NYP Defendants created and entered into a public charitable trust to provide mutually affordable medical care to its uninsured patients.

118.    Plaintiffs and the Class are the intended beneficiaries of this charitable trust created by virtue of the NYP Defendants' acceptance of federal, state and local tax exemptions.

119.    The NYP Defendants have breached their charitable trust obligations to Plaintiffs and the Class by: failing to provide emergency room medical care to Plaintiffs and the Class without regard to their ability to pay for such medical care; charging Plaintiffs and the Class the highest and undiscounted cost of medical care; charging Plaintiffs and the Class significantly more than their insured patients for the same medical services; failing to use their net assets and revenues in the billions of dollars to provide mutually affordable medical care to Plaintiffs and the Class; utilizing aggressive, abusive and humiliating collection practices such as lawsuits, liens, and garnishments to collect such inflated and unreasonable medical debt from Plaintiffs and the Class; and allowing noncharitable for-profit entities to derive a profit from use of their tax-exempt hospitals.  As a result of such conduct, Plaintiffs and the Class have not received the benefit of the charitable trust created for their benefit.

120.    The aforementioned breaches of charitable trust have caused Plaintiff and the Class economic injury and other damages.

## COUNT SIX

### VIOLATION OF THE FAIR DEBT
### COLLECTION PRACTICES ACT, 15 U.S.C. § 1692 *et seq.*

121.    Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

122.    The NYP Defendants and the John Doe Defendants are "debt collectors" under 15 U.S.C. §1692.

123.    Plaintiffs and the Class were and are pursued by the Collection Agencies for debts allegedly owed by patients to the NYP Defendants.  Such debts are covered by 15 U.S.C. §1692a(5).

124.    The NYP Defendants and the Collection Agencies' conduct constitute aggressive, abusive and humiliating collection practices which are prohibited practices under 15 U.S.C. §1692 *et. seq.*

125.    Plaintiffs and the Class have suffered damages as a result of the NYP Defendants' violative collection practices.

## COUNT SEVEN

### VIOLATION OF THE EMERGENCY MEDICAL TREATMENT AND ACTIVE LABOR ACT

126.    Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

127.    Under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. §1395dd, a "participating hospital" must provide a medical screening examination to any individual that comes into their emergency room for an "emergency medical condition" in order to determine whether such emergency medical condition exists.  If such an "emergency medical condition" does in fact exist, the "participating hospital" must provide sufficient medical examination and/or treatment necessary to stabilize the condition.  The express intent of the EMTALA is to prohibit hospitals from denying or delaying emergency medical treatment to patients without medical insurance because of their uninsured status.

35

128.    The NYP Defendants are "participating hospitals" as defined in 42 U.S.C. §1395cc and §1395dd.

129.    Before the NYP Defendants would provide emergency medical screening and/or treatment for "emergency medical conditions" to Plaintiffs and the Class, they first analyzed their ability to pay for such medical care and required Plaintiffs and the Class to sign form contracts agreeing to pay the NYP Defendants in full for unspecified and undiscounted medical charges. The NYP Defendants would not provide emergency medical screening and/or treatment to Plaintiffs and Class unless they were able to pay for such medical care or until they agreed to sign a form contract guaranteeing payment in full for some medical care. Thus, the NYP Defendants refused to treat patients without regard for their ability to pay. Forcing patients to personally guarantee payment is *not* a registration procedure. By conditioning medical screening and/or treatment for "emergency medical conditions" on Plaintiffs' and the Class' ability to pay and financial guarantees, and refusing to provide emergency medical screening and/or treatment until such guarantees were given, the NYP Defendants violated the EMTALA, 42 U.S.C. §1395dd. Such conduct, in failing to provide emergency room medical care to Plaintiffs and the Class without regard to their ability to pay for such medical care, is also a violation of 26 U.S.C. §501(c)(3).

130.    Such violations of 42 U.S.C. §1395dd have proximately caused Plaintiffs and the Class economic injury and other damages.

## COUNT EIGHT

## VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW §349

131.    Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

132.    In violation of the N.Y. Gen. Bus. Law §349, Defendants engaged in unconscionable commercial practices, deception, fraud, misrepresentation, and/or the knowing concealment, suppression, and/or omission of material facts with the intent that others rely thereon.

133.    By charging Plaintiffs and the Class unreasonably high rates for medical care despite their obligations and representations to the contrary, and by pursuing and harassing Plaintiffs and the Class to collect these inflated bills, the NYP Defendants used and deployed unconscionable commercial practices, deception, fraud, false promise and misrepresentation in connection with the obtainment of tax exemptions and the charging practices they employ when treating New York's uninsured. Such conduct is against public policy and has caused substantial economic injury to Plaintiffs and the Class.

134.    Moreover, as alleged above, the NYP Defendants' aggressive, abusive, and harassing efforts to collect such inflated, undiscounted and uncompensated medical debt from Plaintiffs and the Class through collection lawsuits, liens and garnishments, despite their charitable, nonprofit, tax exempt status, is unfair, discriminatory, unethical, immoral, and oppressive. Such conduct is also against public policy and has caused substantial economic injury to Plaintiffs and the Class, including, but not limited to bankruptcy and/or financial ruin.

135.    By virtue of the foregoing, Plaintiffs and the Class members have been damaged.

37

## COUNT NINE

## UNJUST ENRICHMENT/CONSTRUCTIVE TRUST

136.    Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

137.    The NYP Defendants have been unjustly enriched at Plaintiffs' and the Class' expense.  As alleged above, the NYP Defendants failed to utilize their substantial net assets and revenues, valued in the billions of dollars, to provide mutually affordable medical care to Plaintiffs and the Class, and have also realized profits in the millions of dollars by charging Plaintiffs and the Class unreasonably high amounts for medical care.

138.    Plaintiffs and the Class have suffered severe economic injury and other damages as a proximate consequence of the NYP Defendants' unjust enrichment.

139.    As a result of the NYP Defendants' breach of contract along with their wrongful, unfair, discriminatory, abusive, and noncharitable conduct, they are in possession of tax savings, profits and other assets that they, in good conscience and equity, should not be entitled to retain. Plaintiffs and the Class are therefore entitled to all damages resulting from the NYP Defendants' unjust enrichment, including but not limited to, the imposition of a constructive trust in the amount of the NYP Defendants' federal, state and local tax exempt savings.  Plaintiffs and the Class are also entitled to the imposition of a constructive trust on all profits the NYP Defendants wrongfully obtained by charging Plaintiffs and the Class the highest and full, undiscounted cost of medical care.  Plaintiffs and the Class are further entitled to the imposition of a constructive trust on the difference between the amount the NYP Defendants have charged Plaintiffs and the Class and the amount they have charged their insured patients.  Lastly, Plaintiffs and the Class

38

are entitled to the imposition of a constructive trust on the NYP Defendants' net assets and revenues in an amount sufficient to provide to Plaintiffs and the Class mutually affordable medical care pursuant to its charitable, nonprofit, tax exempt status.

## COUNT TEN

### VIOLATION OF 42 U.S.C. §1983 AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

140.    Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

141.    As voluntary participants in the Medicaid program, participating hospitals such as the NYP Defendants are obligated to comply with the requirements of the Medicaid Act and corresponding regulations. As voluntary participants in the Medicare program, participating hospitals such as the NYP Defendants are required to comply with Medicare's laws and regulations.

142.    Medicare and Medicaid provide billions of dollars in funding for "uncompensated" care. The primary source of funding for "uncompensated" care is government dollars. The projected federal, state and local spending available to pay for the care of the uninsured in 2004 is 34.6 billion dollars.

143.    Disproportionate Share Hospital (DSH) payments are payments in the Medicaid and Medicare programs that, along with local tax appropriations, help hospitals finance care to low-income and uninsured patients.

144.    Medicare DSH payments total billions of dollars annually.

145.    Hospitals qualify for Medicare DSH based on their "disproportionate share patient percentage," which is a proxy for how much care hospitals provide to low-income patients. The amount of Medicare DSH that hospitals receive is generally based on their disproportionate share patient percentage, their status as an urban or rural provider, and their bed size.

146.    Medicaid DSH payments also total billions of dollars annually. Medicaid DSH payments grew out of federal legislation in 1981 that required state Medicaid agencies to make allowances when determining reimbursement rates for hospitals that serve a disproportionate number of Medicaid or low-income patients.

147.    The purpose of the federal Disproportionate Share Hospital (DSH) Program and related state funding and distribution programs, is to provide compensation to qualifying hospitals for services provided without charge or for a reduced charge to medically indigent patients.

148.    In addition to enjoying the benefits of federal, state and local tax exempt status, the NYP Defendants have received charity care subsidies from the State of New York. Such funds were distributed to eligible hospitals based on a formula that takes into account documented charity care, the hospital's profitability, and the portion of their revenue that comes from private payers.

149.    Under Medicare and Medicaid federal and state programs, the NYP Defendants claim that federal and state laws compelled them to charge inflated undiscounted rates for uninsured patients.

150.    For example, the AHA's publication "Federal Regulations Hamper Hospitals' Efforts to Assist Patients of Limited Means" contains the following statements blaming federal

40

and state legal requirements for the NYP Defendants' and other nonprofit hospitals' practice of overcharging patients without insurance:

        a.     The difficulties created by the Medicare billing rules are related to the practical requirement that each hospital maintain a uniform charge structure that applies to all patients. In other words, each patient must be charged the same amount for identical services. Such uniformity remains crucial to determining payments for some hospitals, such as critical access hospitals, and also to the submission of accurate cost reports for all hospitals.

        b.     [F]ederal and state anti-kickback laws also contribute to the regulatory confusion. Those laws prohibit hospitals from offering inducements to patients.

        c.     [H]ospitals must levy uniform charges for all patients to ensure compliance with Medicare cost report requirements.

        d.     Because of the Medicare rules described above and the lengths to which CMS has gone to enforce the rules, hospitals continue to believe that the Medicare cost reporting rules require them, in practice, to develop and maintain uniform charges for all patients.

        e.     State and federal anti-kickback laws also create incentives for hospitals to aggressively seek repayment from uninsured patients of limited means.

151.    The NYP Defendants claim that they charged uninsured patients the rates which are allegedly required by federal and state statutes and regulations.

152.    In determining the rates charged to uninsured patients, the NYP Defendants have allegedly acted pursuant to contracts with the federal and state governments.

153.    The NYP Defendants have acted under color of federal and state law and deprived Plaintiffs of rights secured by the Constitution and laws of the United States.

154.    The constitutional deprivation committed by the NYP Defendants resulted from the exercise of rights allegedly based in federal and state authority.

155.    The NYP Defendants extensively rely upon government assistance and benefits. The NYP Defendants implement the federal and state government functions embodied in the Medicare and Medicaid programs and other government programs addressing access to essential medical care.

156.    The NYP Defendants have applied for, and assumed, the role of providing the essential public and government function of health care for uninsured indigent patients in exchange for their tax-exempt status as charitable hospitals.

157.    The NYP Defendants have overcharged uninsured patients and collected or attempted to collect such overcharges with the assistance of state procedures and laws. The NYP Defendants have used and abused state law and procedures to enforce their discriminating charging system against their uninsured patients.

158.    The NYP Defendants' billing and collection practices with uninsured patients have a disparate impact on racial minorities who are disproportionately represented among the uninsured population.

42

159.    The NYP Defendants' conduct has violated 42 U.S.C. §1983 and the constitutional rights of Plaintiffs and the Class under the Fourteenth Amendment to the United States Constitution.

160.    The NYP Defendants' conduct has also violated the constitutional rights of Plaintiffs and the Class under the Fifth Amendment to the United States Constitution. The equal protection component of the Fifth Amendment confers on Plaintiffs and the Class federal constitutional rights. Under color of federal law, the NYP Defendants have violated those rights through their discriminatory excessive overcharges for uninsured patients.

161.    The NYP Defendants' conduct has violated Plaintiffs' and Class' constitutional rights to equal protection of the laws and caused economic injuries to Plaintiffs and the Class.

162.    Based on alleged federal and state law requirements, the NYP Defendants have overcharged uninsured patients and then used state collection laws to obtain judgments and garnish patients' wages or seize bank accounts.

163.    The NYP Defendants have engaged in invidious discrimination against uninsured patients. The NYP Defendants have directly or indirectly placed obstacles in the way of citizens trying to obtain health care. Charging uninsureds considerably more for their health care than insured patients, results in a demoralizing relative barrier for obtaining care. Uninsureds who have gone to the hospital for treatment only to face inflated disparate charges and endure subsequent harassing collections efforts, judgments, and property liens are discouraged from returning to hospitals the next time they need care. Even uninsureds who have never gone to hospital but who are aware of the exorbitant bills associated with medical care are discouraged from obtaining reasonable care in the first place.

43

164.    The end result of uninsured status, discriminatory price gouging, and aggressive collection efforts are well-documented. A recent National Academy of Science's Institute of Medicine Report, entitled Coverage Matters: Insurance and Health Care (2001), details how uninsured patients obtain less medical care, have higher rates of infant mortality, and die at earlier ages. Placing pricing obstacles in between uninsureds and necessary medical care jeopardizes the fundamental values of life, liberty and property. Even for those who never pay their bills, life and liberty are impinged by the barriers to healthcare erected by the disparate hospital billing practices.

165.    Charging the uninsured multiple times what insured patients and Medicare patients are charged is arbitrary and bears no relationship to the actual cost of such care. The pricing scheme does not further a legitimate "government interest."

166.    Furthermore, aside from not promoting a legitimate government interest, the widely disparate pricing system actually serves to frustrate government goals. Specifically, when viewed in context, the disparate pricing scheme is antithetical to the government interest of promoting health and increasing access to medical care. Government funding – through Medicare, Medicaid, Disproportionate Share Hospital reimbursements and tax exemptions – is aimed at improving societal health generally and, in particular, encouraging access for indigent and uninsured patients.

167.    By overcharging the uninsured, fewer uninsured patients are able to pay their bills and more of them become dissuaded (directly and indirectly) by their hospitals from seeking further care. Obviously, when hospitals become associated in the minds of the uninsured with exorbitant bills, harassing collections agents, threatening phone calls, humiliating court

44

judgments, wage garnishments, and bankruptcies, the natural Pavlovian response will be to avoid medical care in the future. This has been the case.

168.    The NYP Defendants' violations of 42 U.S.C. §1983, the Fourteenth Amendment, and the Fifth Amendment to the United States Constitution have caused economic injuries to Plaintiffs and the Class.

169.    Study after study has shown that the net effect of uninsurance and the associated medical care avoidance undermines public health, preventative medicine, and the control of both acute and chronic diseases. The inarguable result is the spread of communicable diseases and the unchecked progression of chronic ones. The end points are premature death, unnecessary suffering, and, when a particular uninsured becomes poor enough or disabled enough to qualify for Medicaid or old enough to qualify for Medicare, a greatly inflated cost to society at large.

**COUNT ELEVEN**

**FRAUD**

170.    Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

171.    When a patient agrees to pay in advance and as a condition of treatment, he makes the assumption that he is not being gouged by unfair or unreasonable prices.

172.    Plaintiffs had every right to believe that a not-for-profit hospital would not charge them a premium rate.

173.    A medically indigent patient in pain and likely to sign any document to obtain treatment is not in a bargaining position to negotiate terms to a form contract that must be signed

45

(with payment guaranteed in advance) to obtain that treatment. Therefore, a relationship founded on unequal bargaining power exists.

174.    The NYP Defendants have falsely represented to the public, these Plaintiffs, and the Class, that they are "charity-care" providers who treat all patients with compassion and without regard to ability to pay. The NYP Defendants have falsely represented to the public, these plaintiffs, and the Class that they are not-for-profit organizations that benefit the community by providing for the health needs of all -- including the uninsured and the indigent. The NYP Defendants have falsely represented to the public, these Plaintiffs, and the Class that they charge uniform rates and are compelled to do so by federal and/or state laws and regulations. Defendants have also falsely represented to Plaintiffs, the Class, and the public that, even if not given charity care, they would only be charged "fair," "reasonable," "just," and/or "customary" rates for any services they received. In fact, Plaintiffs and the Class were charged anything but "just" or "reasonable" rates. They were charged rates that greatly exceeded rates charged to the government or insured patients. Plaintiffs and the Class were never told that they would be charged multiple times more than other patients for the same services. Such representations and omissions were material to Plaintiffs and the Class as they signed the NYP Defendants' form contracts guaranteeing payment.

175.    The NYP Defendants' false representations were directly relevant to the expectations of Plaintiffs and the Class when they sought medical evaluations and treatment from the NYP Defendants. The false representations of the NYP Defendants materially relate to Plaintiffs' and the Class' receipt of medical services from the NYP Defendants, as such

46

information is relevant to whether or not members of the class would seek services from the NYP Defendant providers.

176.    The NYP Defendants made these and other representations knowing them to be false. Specifically, the NYP Defendants knew that many patients entitled to receive true charity care or discounted care would not and did not receive it when seeking health care from their facilities. The NYP Defendants knew that they falsely represented "bad debt" as "charity care" and that their erroneous categorizations were passed on to the public (including this Class), the government, and the media. The NYP Defendants knew that they vastly overstated their "community benefit" by overstating the value of charity care and unreimbursed care provided to uninsured and indigent patients, and by failing to mention the stress and financial ruin left in the wake of their deceit and collections aggression.

177.    Defendants provided false representations and erroneous data to the public (including this Class), the government, and the media, in an attempt to mislead and for the purpose of directly and indirectly pursuing profits. By making their false representations, the Defendants intended for the federal, state and local governments to continue providing them with valuable tax-exempt status and other valuable government subsidies and benefits such as participation in Medicare, Medicaid, and the Disproportionate Share Hospital programs.

178.    By making their false representations, the Defendants intended to promote their public images as compassionate providers of health services, to improve their market share, and to further boost their profits.

179.    Using creative accounting and reporting practices, Defendants have provided repeated false reports to the public, state and federal governments, as well as the media. In

47

addition, Defendants have reiterated their misrepresentations in the form of hospital and health

system newsletters, annual reports, and their website. Amid Defendants' bombardment with

propaganda and misinformation, Plaintiffs and the Class justifiably relied on the false

representations of the NYP Defendants and sought medical care from the Defendants rather than

seeking such care from other health providers or foregoing such care altogether.

180.    Because of the Defendants' material misrepresentations, Plaintiffs and the Class

have suffered economic damages and other damages.

## COUNT TWELVE

## CONSTRUCTIVE FRAUD

181.    Plaintiffs repeat, reallege and incorporate the allegations contained in the

paragraphs above as if fully set forth herein.

182.    As set forth above, NYP is incorporated as a not for profit corporation under the

laws of New York.

183.    NYP is also exempt from taxes in New York as a charitable institution.

184.    The purpose and duty of health care providers such as NYP, a charitable

institution, is to provide discounted care to those persons least able to afford it.

185.    The persons to whom this duty is owed are those persons, like Plaintiffs, who are

unable to obtain affordable health insurance.

186.    NYP holds itself out to Plaintiffs and the Class as a charitable institution, and

NYP is in a relationship of trust and confidence, as a matter of law, with them.

187.    NYP has superior knowledge and information about its duties as a charitable

institution to provide charitable care to Plaintiffs and other uninsured patients.

48

188.    Plaintiffs and other uninsured patients to whom such duty is owed have virtually no knowledge as to what NYP's duties toward them are in this respect or even that they are eligible to be considered for discounted medical care.

189.    Plaintiffs and other uninsured patients rely upon NYP to perform its duties to them in good faith.

190.    By the acts set forth above, and by charging Plaintiffs and other uninsured patients inflated, discriminatory, disparate and unconscionable rates, the NYP Defendants have breached this relationship of trust and confidence.

191.    By the acts set forth above, NYP has engaged in overpricing and other conduct which is inherently fraudulent because of its detrimental effect on the public interest in providing health care to the uninsured and because of its detrimental effect upon public confidence generally in the integrity of charitable institutions.

192.    By the acts set forth above, and by its overpricing and other acts, NYP has engaged in conduct which tends to inherently deceive Plaintiffs and other uninsured patients who are the target of NYP's overpricing and who are entitled to assume that they are not being charged at rates higher than those paid by patients covered by private insurance.

193.    Furthermore, by such acts, NYP conceals and fails to disclose to Plaintiffs and others certain material information, namely, that NYP is charging Plaintiffs and other uninsured patients significantly more than what it accepts as payment from patients covered by private insurance and it conceals and fails to disclose that NYP has a duty to provide discounted charitable care to the very persons who are being required to pay these excessive and unreasonable rates.

49

194.    NYP also fails to warn or advise Plaintiffs and other uninsured patients at the time of admission that they may receive discounted medical care and fails to take any steps to help them obtain such care, but instead takes in Plaintiffs and others and charges them its highest inflated prices.

195.    NYP also breaches this relationship of trust and confidence and breaches New York law, as set forth above, by using abusive methods to collect inflated rates from Plaintiffs and other uninsured patients.

196.    NYP files suit against uninsured patients, while it is engaged in the concealment from them of the material information as set forth above.

197.    Furthermore, in collecting these sums, NYP singles out those individuals who are in the weakest position economically and cannot afford to retain legal counsel to represent them.

198.    Because of the relationship of trust and confidence, Plaintiffs and other uninsured necessarily rely upon NYP to perform its duties to them and have suffered economic damages from NYP's failure to do so.

## COUNT THIRTEEN

## CIVIL CONSPIRACY/CONCERT OF ACTION

199.    Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

200.    The AHA advises NYPHS and its nonprofit hospital members on their billing and collection practices concerning the uninsured through various internal memos and/or "white papers" for the purpose of increasing NYPHS' profits and government reimbursements.

201.    In these internal memos, such as the December 17, 2003, memo titled "Federal Regulations Hamper Hospitals Efforts to Assist Patients of Limited Means," the AHA advised NYPHS and its member nonprofit hospitals that they were prevented from providing discounts to Plaintiffs and the Class and were required to subject Plaintiffs and the Class to abusive collection practices. The AHA, through these internal memos, conspired and acted in concert with NYPHS to charge Plaintiffs and the Class the highest undiscounted cost for medical care and aggressively collect such inflated medical debt through abusive lawsuits, liens and garnishments.

202.    Moreover, the AHA actively conspired and acted in concert with NYPHS to wrongfully retain its tax exempt status and breach NYPHS' contracts with the United States Government, the State of New York and other local governmental bodies, Plaintiffs and the Class by: advising NYPHS that it charge and collect undiscounted rates for medical care from Plaintiffs and the Class; falsely representing to United States Health and Human Services Secretary, Tommy Thompson ("Secretary Thompson"), that NYPHS was required to charge and collect undiscounted rates for medical care from Plaintiffs and the Class; and concealing and misrepresenting the true amount of charity care that NYPHS provided to Plaintiffs and the Class.

203.    Through such acts, the AHA also conspired and acted in concert with NYPHS to violate the New York General Business Law §349, and to breach NYP's duty of good faith and fair dealing to Plaintiffs and the Class.

204.    Such advice, assistance, false justification, concealments and misrepresentations have allowed and enabled the NYP Defendants to: fail to provide emergency room medical care to Plaintiffs and the Class without regard for their ability to pay for such medical care; charge Plaintiffs and the Class the highest and full undiscounted cost of medical care; fail to provide

51

mutually affordable medical care to Plaintiffs and the Class; charge Plaintiffs and the Class substantially more than their insured patients for the same medical services; fail to use their net assets and reserves in the billions of dollars to provide mutually affordable health care to Plaintiffs and the Class; and engage in aggressive, abusive, and harassing collection practices such as lawsuits, liens, and garnishments to collect such inflated and unreasonable medical debt from Plaintiffs and the Class.

205.    Such acts of conspiracy and in concert action by the AHA have proximately caused NYPHS to be unjustly enriched at Plaintiffs' and Class' expense and have also proximately caused Plaintiffs and the Class economic injury and other damages.

### COUNT FOURTEEN

### AIDING AND ABETTING

206.    Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

207.    The AHA, through its internal memos and other advisory assistance, aided and abetted NYPHS in charging Plaintiffs and the Class the full undiscounted cost for medical care and in seeking to collect such grossly inflated medical debt from Plaintiffs and the Class through abusive collection lawsuits, liens and garnishments.

208.    The AHA aided and abetted NYPHS' breach of its tax exempt contracts with the United States Government, the State of New York, other local governmental bodies, Plaintiffs and the Class, by advising NYPHS that federal regulations prevented it from providing discounts to Plaintiffs and the Class and required it to aggressively collect such grossly inflated medical debt from Plaintiffs and the Class through collection lawsuits, liens and garnishments.

209.    The AHA also aided and abetted NYPHS' breaches of contract by falsely justifying and representing to Secretary Thompson and other government entities that the Medicare regulations prevented NYPHS from providing discounts to Plaintiffs and the Class and required it to aggressively collect such grossly inflated medical debt from Plaintiffs and the Class through collection lawsuits, liens and garnishments.

210.    The AHA further aided and abetted NYPHS' breaches of contract by falsely representing and concealing the true cost of charity care provided by NYPHS to Plaintiffs and the Class.

211.    Through these acts, the AHA also aided and abetted NYPHS' violations of the New York General Business Law §349 and NYPHS' breach of its duty of good faith and fair dealing toward Plaintiffs and the Class.

212.    Such substantial assistance by the AHA allowed and enabled NYPHS to: fail to provide emergency room medical care to Plaintiffs and the Class without regard for their ability to pay for such medical care; charge Plaintiffs and the Class the highest and full undiscounted cost of medical care; fail to provide mutually affordable medical care to the Plaintiff and the Class; charge Plaintiffs and the Class substantially more than its insured patients for the same medical services; fail to use its net assets and revenues in the billions of dollars to provide mutually affordable health care to Plaintiffs and the Class; and engage in aggressive, abusive, and harassing collection practices such as lawsuits, liens, and garnishments to collect such inflated and unreasonable medical debt from Plaintiffs and the Class.

213.    The AHA's substantial assistance has proximately caused NYPHS to be unjustly enriched at Plaintiffs' and the Class' expense and has also proximately caused Plaintiffs and the Class economic injury and other damages.

## COUNT FIFTEEN

### INJUNCTIVE/DECLARATORY RELIEF

214.    Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

215.    As a result of Defendants' wrongful, unfair, discriminatory, and unconscionable charging and collection practices, Plaintiffs and the Class have suffered and, unless abated, will continue to suffer severe and irreparable harm and injury.

216.    Accordingly, Plaintiffs and the Class respectfully request that this Court enter a preliminary and/or permanent injunction, in accordance with FRCP 23(b)(2), ordering Defendants to cease and desist: charging Plaintiffs and the Class a higher amount for medical services than its insured patients for the same services; and utilizing aggressive, abusive and humiliating collection practices to collect such inflated and unreasonable medical debt from Plaintiffs and the Class.

217.    Plaintiffs and the Class also seek a prospective order from the court, in accordance with FRCP 23(b)(2), requiring Defendants to: provide mutually affordable medical care to Plaintiffs and the Class; charge Plaintiffs and the Class no more for medical services than they charge their insured patients; and to cease their attempts to collect outstanding medical debt from Plaintiffs and the Class until they have complied with a 180-day waiting period and attempted in

good faith to settle such outstanding debt with Plaintiffs and the Class through a graduated payment plan or other means.

## EQUITABLE TOLLING AND STATUES OF LIMITATIONS

218.   Any applicable statutes of limitations have been tolled by Defendants' deceptive pricing practices. Defendants have concealed from Plaintiffs and the Class the truth about Defendants' practice of falsely representing that their charges are uniform, fair, and reasonable, thereby tolling the running of the applicable statutes of limitations.

219.   Plaintiffs and the Class could not have reasonably discovered Defendants' wrongful and discriminatory pricing practices as alleged herein.

220.   Defendants are estopped from relying on any statute of limitations defense because of their unfair and deceptive conduct.

221.   Until shortly before filing the initial Complaint, Plaintiffs had no knowledge that Defendants engaged in a discriminatory and deceptive pricing practice which charged uninsured patients significantly higher rates than patients covered by insurance, Medicare or Medicaid.

222.   Because of the Defendants' affirmative acts of concealment in which they falsely represented that their charges are uniform, fair, and reasonable, Plaintiffs assert the tolling of any applicable statutes of limitations affecting their claims.

223.   At times of medical need, Plaintiffs and the Class sought medical care from the NYP Defendants, believing that such Defendants would evaluate and treat them regardless of whether they could pay.

224.   Plaintiffs and the Class believed that the NYP Defendants would make good faith efforts to determine a person's ability to pay *following* evaluation or treatment, and would not

55

bill or charge those among them who were unable to pay. Thus, Plaintiffs and the Class believed that free care or reduced cost care would be provided to them based upon their ability to pay and based upon a fair and just financial need evaluation.

225.    However, upon arriving at the facilities of the NYP Defendants, Plaintiffs and the Class were forced to sign forms guaranteeing payment as a condition of their treatment. Their harsh choice was: (1) to guarantee payment for unspecified charges, or (2) to ignore the medical problems and emergencies that brought them to the hospital in the first place, thereby placing their lives and/or health at risk. Given this unconscionable "choice," Plaintiffs and the Class signed these forms under duress.

226.    These "not-for-profit" defendants who enjoy tax exempt status and hold themselves out to the public as benefactors who provide charity care to those in need, have turned their backs on their commitments and the patients they are supposed to compassionately help and have instead looked to profits.

227.    Given the coercive and stressful circumstances under which these forms were signed, they are not valid contracts and are void. Similarly, the crushing debt, crippling judgments, and unjust liens derived from these contracts signed under duress are void as well.

## DAMAGES

228.    Plaintiffs repeat, reallege and incorporate the allegations contained in the paragraphs above as if fully set forth herein.

229.    As a direct and proximate result of the NYP Defendants' breaches of contracts, breaches of their obligations as charitable institutions, breaches of duty of good faith and fair dealing, violations of the New York General Business Law §349, breaches of charitable trust,

56

unjust enrichment, violations of the Fair Debt Collections Practice Act, violations of EMTALA,
violations of 42 U.S.C. §1983 and the Fourteenth Amendment of the United States Constitution,
and violations of the Fifth Amendment of the United States Constitution, fraud, and constructive
fraud, and the AHA's conspiracy and actions to aid and abet such breaches and violations,
Plaintiffs and the Class have suffered economic injury and damages.

**WHEREFORE**, on behalf of themselves and the Class, Plaintiffs pray for judgment and
relief against all Defendants, jointly and severally as follows:  Plaintiffs request that upon a trial
of this action, judgement will be entered against Defendants for:

A.    all economic, monetary, actual, consequential, and compensatory damages caused
by Defendants' conduct, the amount of which to be proven at trial;

B.    all economic, monetary, actual, consequential, and compensatory damages caused
by the Collection Agencies' conduct, the amount of which to be proven at trial;

C.    a constructive trust to be imposed on:

a.    Defendants' federal, state and local tax exempt savings;

b.    Defendants' profits obtained from charging Plaintiffs and the Class the
highest and full, undiscounted cost for medical care; and

c.    Defendants' net assets and revenues in an amount sufficient to provide
Plaintiffs and the Class mutually affordable medical care; and

D.    reasonable attorneys fees, costs, expenses and disbursements of suit pursuant to
inter alia, 15 U.S.C. § 1640 and 15 U.S.C. § 1692(k)(a)(2)(B);

E.    such other relief as this Court may deem necessary, proper and/or appropriate.

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all claims so triable.

Dated: September 20, 2004

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**

By: _____
    Keith M. Fleischman (KF-9199)
    Ronald J. Aranoff (RA-4690)
    10 East 40th Street, 22nd Floor
    New York, New York 10016
    Telephone: (212) 779-1414
    Facsimile: (212) 779-3218
    **Attorneys for Plaintiffs**